**NO. 15-55779**

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

**SOLID LANDINGS BEHAVIORAL HEALTH, INC.; SURE HAVEN in its own name and dba SOLID ROCK RECOVERY; FPS LLC; STEPHEN FENNELLY; ELIZABETH PERRY; AND JOHN DOE,**

*Plaintiffs and Appellants*

**v.**

**CITY OF COSTA MESA,**

*Defendant and Appellee*

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**(8:14-CV-01338-JVS-JCG)**

_____

**SECOND MOTION FOR PRELIMINARY INJUNCTION**

**PENDING REVIEW [FRAP 8]**

**Urgent Motion - Relief required before November 20, 2015**

_____

Leonard C. Herr, #081896

Ron Statler, #234177

HERR PEDERSEN & BERGLUND LLP

100 Willow Plaza, Suite 300

Visalia, California 93291

Tel.:(559) 636-0200

Fax: (559) 636-9759

Attorney for Plaintiffs/Appellants

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii-iv

I.   STATE OF THE CASE ............................................................................ 2

II.  THE ORDINANCE TARGETS THE DISABLED, KICKS MANY FROM THEIR HOMES, MAKES IT HARD TO FIND NEW ONES IN THE CITY'S R1 NEIGHBORHOODS, AND FAILS TO REASONABLY ACCOMMODATE THEM........................................................................ 3

    A.  The Ordinance does not benefit the disabled, but rather singles them out against the non-disabled.................................................... 3

    B.  The limitations on the disabled are not designed to serve a legitimate safety interest; they just serve base fears and prejudices. ............................................................... 7

    C.  The Ordinance does not provide reasonable accommodation. ........ 9

    D.  The City has admitted the Ordinance is not supported by data ..... 10

    E.  The Ordinance limits housing for the disabled by making it more expensive than housing for the general public .............................. 11

    F.  The City's application process for special use permits and reasonable accommodations violates the FHA and ADA. .............................. 11

III.  ENFORCEMENT OF THE ORDINANCE SHOULD BE PROHIBITED TO PRESERVE THE STATUS QUO PENDING DETERMINATION OF THE RIGHTS OF THE PARTIES ..................................................... 15

IV.  IRREPARABLE INJURY AND INADEQUATE LEGAL REMEDIES- ARE ALL IMPLICATED BY ORDINANCE.......................................... 16

i

A. Plaintiffs and all persons seeking treatment and recovery from addiction in Costa Mesa will be irreparably injured by enforcement of the Ordinance. ...................................................... 18

B. There can be no adequate legal remedy for interrupted efforts at recovery. ................................................................... 19

V.   CONCLUSION .......................................................................... 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Bangerter v. City of Orem*,
  46 F3d 1491 (10th Cir. 1995);.......................................................... 17

*Baxter v. City of Belleville, Ill.*
  720 F. Supp. 720, 734 (S.D. Ill. 1989) ........................................... 18

*Forest City Daly Hous., Inc. v. Town of North Hempstead*,
  175 F.3d 144, 153 (2d Cir. 1999) .................................................... 17

*Gresham v. Windrush Partners, Ltd.*,
  730 F.2d 1417, 1423-24 (11th Cir. 1984)........................................ 18

*Groome Resources, Ltd. v. Parish of Jefferson*,
  234 F.3d 192, 200 (5th Cir. La. 2000).............................................. 17

*Human Res. Research & Mgmt. Group v. County of Suffolk*,
  687 F. Supp. 2d 237, 261 (E.D.N.Y. 2010)................................. 17,19

*Jackson Dairy, Inc. v. H.P. Hood & Sons*,
  596 F.2d 70, 72 (2d Cir. 1991) ....................................................... 17

*Pettus v. Cole*,
  49 Cal.App.4th 402, 458-460 (1996) ................................................ 6

## Federal Statutes

42 U.S.C. § 3604(f)(2) .................................................................... 16
42 U.S.C. § 3613(c) ........................................................................ 17

## State Statutes

Cal. Health & Safety Code § 11834.26............................................. 18
Cal. Health & Safety Code § 11834.30............................................... 2
Cal. Lab. Code § 1026...................................................................... 6

**Rules/Regulations/Ordinances/Other**

Costa Mesa Ordinance No. 14-13 ............................................................ *passim*

FRAP 8(a)(1)(C) .......................................................................................... 3

22 Cal. Code Reg. 80001(c)(3) ................................................................ 18

9th Cir. R. 27-3(b) ....................................................................................... 3

"The problem that we have is that this [sober living] industry has located itself right here in Orange County and a major part of it is in Costa Mesa." So proclaimed then-Mayor James Righeimer speaking from the dais at a regular City Council meeting on March 4, 2014, just before he told the assembly that the Appellee-City's battle against sober living homes is just like old municipal battles against pornography. See, Exh. 1 to the Decl. of K. Ford ("Ford Dec."), Doc. No. 44-6 . The City then passed the Ordinance that is challenged in this action, Ordinance 14-13, which will force the closure of several sober living homes, including homes owned and operated by the Appellants, Solid Landings, et al. [collectively, "SL"]. The Ordinance violates the Fair Housing Act, which makes discrimination in housing against the disabled unlawful. Enforcement of the ordinance must be enjoined ere vulnerable people trying to rebuild lives from the ashes of addiction are cast into chaos and back to the sources of their addictions.

Sober living homes provide a healthy, household environment that is "non-judgmental," and drug free. See, paragraphs 3-5, Decl. of S. Fennelly ["Fennelly Decl."] Doc. No. 44-3. They give recovering addicts a place to live with the mutual support of others trying to work through recovery, while at the same time not forcing them into an institutional dormitory reminiscent of prison or some other institution. Fennelly Decl., *id*. The difference between sober living homes and detoxification, treatment, and recovery homes is that sober living homes do not provides services

to further the tenant's detox, treatment, or recovery; just a drug free place to live. If a person needs those services where they live, they will stay in a state-licensed residential care facility, which is not subject to this ordinance. Cal. Health & Safety Code § 11834.30.

City has declared efforts to house recovering addicts in a drug free environment injurious to that City by passing Ordinance number 14-13. The Ordinance's purpose and the City's intent behind its enactment and enforcement is plain; the City is trying to shut down a bunch of sober living homes and make it near impossible to open a new one. While this Court reviews the district court's dismissal of the complaint below, enforcement of Ordinance 14-13 should be enjoined or, in the alternative, the Court should enjoin enforcement of: (1) the Ordinance's 650 foot set-back requirement for sober living homes; and (2) the application process that invades employees' privacy rights, requires application steps that are discriminatory against persons disabled by addiction, and is not supported by the language of the Ordinance.

## I. STATE OF THE CASE

This is the second time this motion has been brought before the Circuit Court. The first, filed June 1, 2015 [Circuit Court Docket 4-1, 4-2], was denied without prejudice until Sold Landings sought injunctive relief pending appeal from the District Court. SL did so, and the District Court denied the motion on September

18. District Court Doc. 78. Before the appeal, SL sought injunctive relief with each of the complaints; these were denied as moot after the District Court granted City's motions to dismiss, the second time with prejudice.

SL therefore respectfully moves this Court a second time for a preliminary injunction pending review under FRAP 8(a)(1)(C). This motion is substantially the same as the earlier motion. The relevant parts of the record appear at Doc. Nos 44-1 through 44-8.

This motion is labelled "urgent," but SL recognizes that the "urgency" is imposed by time sensitivity, not immediacy. The face of the ordinance gives SL until November 20 of this year to comply, and the City has stated in other filings that SL has until January, 2016. While either is a good amount of time, an urgent motion in this Circuit is one that must be decided by a date certain more than 21 days out. Circuit Rule 27-3(b). Despite there being some time before either of these dates passes, these dates have meaning and consequences. SL takes City at its word, assuming the Court will as well. SL asks that a decision be rendered by December 31, 2015.

## II. THE ORDINANCE TARGETS THE DISABLED, KICKS MANY FROM THEIR HOMES, MAKES IT HARD TO FIND NEW ONES IN THE CITY'S R1 NEIGHBORHOODS, AND FAILS TO REASONABLY ACCOMMODATE THEM.

City's intention to make it more difficult for recovering drug and alcohol addicts to find a place to live in Costa Mesa is made plain by the new rules to which

3

such homes are subjected. The fact that the rules work to the detriment of these disabled persons is not only plain on the face of the ordinance, it is made vulgar by falsehoods used to make it sound as though the ordinance works to their benefit.

### A. The Ordinance does not benefit the disabled, but rather singles them out from the non-disabled.

Sober living homes located in the zoning areas of City cannot be within 650 feet of one another. The Ordinance, § 13-311(a)(10)(i). There is no provision for grandfathering in current homes that are within that limit [or, making them pre-existing non-conforming uses]. The City declared this to be acceptable at a meeting on October 7 when legal counsel for the City told the Council that, once the Ordinance is effective, homes already within 650 feet of one another will be locked in a race to City Hall: "[W]hoever submits a completed application and meets all of the requirements first gets to stay and everybody else goes. It's that simple." [Exh. 4, p. 88, Ford Decl., Doc. No. 44.]

As counsel Gerli said, it is simple; the rest must shut down. There will be no exceptions made: the City has made clear in pre-litigation meetings with SL that the City Council will not budge on the 650 foot set-back for all sober living homes. See, Decl. L. Herr ["Herr Decl."] Doc. No. 44-2. The Ordinance places no limitation on the ability of non-disabled persons to live in R1 zones.

Remarkably, the City claims that its limitations on sober living homes are not limitations at all, but that they actually benefit persons in recovery from drug and

4

alcohol addiction because sober living homes are boardinghouses, which are banned in R1 zones. The City argues that allowing sober living homes at all is actually a benefit for the disabled not enjoyed by any other class of person.

That is plainly false and, with apologies to Mr. Tolkien, "tricksy." It is a tricksy argument because it relies on parsed information. While it is true that boardinghouses are banned in R1 neighborhoods, and sober living homes are boardinghouses, these facts alone misrepresent the story of sober living home regulations by the City. Sober living homes were not considered boardinghouses until this Ordinance passed. Until then, sober living houses were "residential treatment facilities" that were not regulated like boardinghouses. City knew it could not pass these rules against sober living homes, so it prohibited boardinghouses. City then "grandfathered in" boardinghouses in R1 zones that already operated for the general population and allowed them to continue operating as existing non-conforming uses. [Ford Decl., Exh. 3, p. 33, Doc. No. 46-6.] Sober living homes enjoy no such grandfathering, be they pre-existing or no. Thus, the Ordinance facially favors existing boardinghouses for the non-disabled over existing boardinghouses for the disabled [sober living homes].

There is more. The Ordinance is also discriminatory against future sober living homes through over-discrimination. Sober living homes were not boardinghouses until made so by the Ordinance. They were residential services

5

facilities, were run by the same rules as the rest of the houses in R1 neighborhoods. [Ford Decl., Exh. 4, p. 63, Doc. 46-6.]

In other words, sober living homes were not part of a prohibited class for which exceptions were made: it was a class that suffered no out-of-the-ordinary limitations until it was made part of a prohibited class. That is not the conferring of a benefit, it is the imposition of new limits. They just happen to be limits that extend to others [i.e., over discrimination]. There is no difference between imposing new limits on sober living homes and making sober living homes a new part of a limited class of homes. City admits as much in both its motion to dismiss the initial complaint and in its opposition to the first motion for injunctive relief that it banned boardinghouses and redefined boardinghouses to include sober living homes "to that end." Ford Decl., Exh. 9, Doc. No. 44-7.

The Ordinance requires that SL submit the names of all employees for a background check and to disclose whether they are in recovery. Ford Decl., Exh. 2, p. 14, Doc. 44-7. Even if the employee privacy issues regarding past illegality were hard to spot, the illegality of disclosing an employee's medical history is obvious, as is the potential that SL will be forced to invade an employee's "autonomy privacy," undermining the employee's self-concept and image as a reliable employee in a manner that runs counter to the law. Cal. Lab. Code § 1026; *Pettus v. Cole*, 49 Cal.App.4th 402, 458-460 (1996). Bottom line: City is forcing SL to break federal

and state anti-discrimination laws to satisfy a local zoning ordinance.

SL has homes that are within 650 feet of one another, employs addicts who have undergone treatment and now live in recovery, and provides homes to people who have completed treatment, both initial and outpatient, but want to stay in a sober living environment. Fennelly Decl., paragraphs 11, 12 and 13, Doc. No. 44-3. The suggestion is remarkable: City has passed a rule prohibiting sober living environments for those trying to recover from addiction.

Beyond that, these limitations are imposed against the disabled only. There is no prohibition against providing the non-disabled with a sober living environment. There is no mandatory eviction or discipline against others in R1 neighborhoods for drinking or doing other drugs. The only class of persons prohibited from living too close to one another are recovering addicts trying to live in a sober living home. The City admits this is done to protect "the single largest financial investment of [non-disabled person's] lives." Ordinance Recitals, P.1. The City Council has declared: living too close to the disabled destroys property values, without a shred of evidence to support the conclusion.

### B. The limitations on the disabled are not designed to serve a legitimate safety interest; they serve base fears and prejudices.

City made no effort to determine if there was a problem and then come up with a reasonable way to correct the problem. Instead, the City Council heard a good deal of anecdotal opinions from locals demonstrating animus against sober living

7

homes, while, the Council and Planning Commission shared some of their own.

Mayor Righeimer was apparently acutely aware of the discriminatory nature of his actions: rather than rebuking disparagement of the disabled at a meeting in June, 2014, Mayor Righeimer coached the public on what to say: "do not make any comments on it that would seem to be discriminatory," discouraging the use of the phrase "those people." [Ford Decl., Exh. 5, p. 97, Doc. No. 44-6.] At the same time, he encouraged complaints, essentially asking the public to give the Task Force the ammunition it needed to remove sober living homes from the community. *Ibid.*

Council Member Monahan also demonstrated open animosity to sober living homes, when he told a story at the second reading of the Ordinance at the Council Meeting on October 21, 2014 about one that closed several years ago after the owner got "tired of being hassled;" since then, "there has been a lot that did not go away, that maybe should have."   [Ford Decl., Exh. 6, pp. 114-115, Doc. No. 44-6.]

Several citizens put political pressure on the Council to pass the Ordinance, regardless of whether it was in violation of the law.  When Mr. Monahan spoke wistfully of a time when landlords to the disabled could be hassled until they chose to leave on their own, Jesus Rios told the City Council that those recovering from drug and alcohol addiction are not really disabled, they are simply weak: "if I want to live like that I should go back to Santa Ana." [Ford Decl., Exh. 6, pp. 110-111, Doc. No. 44-6].

Other citizens demonstrated that their concerns arise not from legitimate safety concerns, but from baseless fear prompted by stereotypes and encouraged by the Mayor. For example, at the October 7, 2014 City Council meeting, Carol Williams told the City Council that since a sober living home moved in across the street, she bought a security system and two German Shepherds even though, "it's not that they are a real problem but it's a psychological thing…." But it is "pretty disgusting" that Costa Mesa has sober living homes. [Ford Decl., Exh. 3, pp. 42-43, Doc. No. 44-6.]

The City further limits the ability of these disabled persons to gain tenancies by reducing the number of homes, increasing the cost of rent, and by subjecting the disabled to stigma and humiliation by, among other things, requiring the operators of sober living homes to maintain space between homes, requiring operators and their employees to undergo background checks, and requiring tenants to be subject to 24-hour supervision.

**C.     The Ordinance does not provide reasonable accommodation.**

While the City has said a sober living home operator can request relief from the 650 foot set-back rule, the City has also made plain it has no intention of granting a reasonable accommodation to that rule. Ms. Gerli has explained that "necessity" must be shown: "not to just a particular facility, but as to facilities of that type in general…. [T]hey would have to demonstrate it as to all those types of homes in the

City or in the R1 zone in this case." [Ford Decl., Exh. 4, p. 75, Doc. No. 44-6.] Ms. Gerli has already said some stay open but others have to close, so the City has already determined there is no necessity. The City is not offering a reasonable accommodation; it is inviting requests that will not be granted.

### D. The City has admitted the Ordinance is not supported by data.

City staff have admitted, at both public meetings and during inspections of sober living homes, there is no evidence to support a conclusion that safety is compromised by the presence of sober living homes. For example, City Code Enforcement Officer Mike Tucker, at inspections of Solid Landings' sober living homes, admitted that the City actually has no data to support its conclusion that sober living homes create safety concerns. See, Declaration of J. Webb ("Webb Decl.") February 19, 2015, Doc. No. 44-4. On another occasion, Mr. Tucker told SL' employees that permits are required for sober living homes regardless of whether the law actually requires it. See, Decl. Y. Umana ("Umana Decl.") signed February 17, 2015, Doc. No. 44-5. That comports with a comment from an attorney for the City who told the Council at its October 7, 2014 meeting about whether or not there is a so-called over-concentration of sober living homes: "we don't really have data with respect to unlicensed facilities." [Ford Decl., Exh. 3, p. 31, Doc. 44-6.] That means the City imposed a set-back on sober living homes based on "institutionalization" despite no supportive data to show that institutionalization exists and despite no

supportive data to show a threat to public safety. The City's safety concerns spring from the kinds of base fears expressed by Ms. Williams and stereotypes like those expressed by Mr. Rios.

### E. The Ordinance limits housing for the disabled by making it more expensive than housing for the general public.

The Ordinance discriminates against the disabled by, among other things, requiring 24 hour supervision of tenants in sober living homes. This 24 hour supervision must be on-site. No other class of tenant is subject to this requirement – indeed, the definitions of other boardinghouses expressly contemplate no on-site management whether they are in R1 zones or grandfathered. And, sober living home employees must undergo background checks not required of any other class of landlord by the municipal code. Costs obviously increase.

### F. The City's application process for special use permits and reasonable accommodations violates the FHA and ADA.

After enactment of the Ordinance, the City published an application, which must be completed to be in compliance with the Ordinance. This application was prepared in secret, and evidences a discriminatory intent by the City: a comparison of the Ordinance with the Costa Mesa Sober Living Application (Application) for a special use permit illustrates this. The discriminatory intent is apparent from inconsistencies between what is required in the Ordinance and additional requirements that appear, for the first time, in the Application. Each reference to a

"section" in this subheading is in Doc. No. 44-6, Exh. 2 of Ms. Ford's declaration – the Application Packet is attached as Exhibit 7 to the same declaration.

In examining the Application, the inconsistencies become apparent as early as page one (1). Under the heading, "HOUSE MANAGER INFORMATION," the Application requests the house manager provide his/her work schedule, far in excess of Section 13-311(a)(1)(2) which requires the house manager to provide only his/her name, address, phone number, and driver's license. While Section 13-311(a)(4) requires either resident- or 24 hour on-site- management, the Ordinance does not require the house manager to provide a work schedule during the Application.

The Ordinance, at Section 13-311(a)(8) requires a non-owning sober living home operator to have written approval from the property owner, but the affidavit on page three of the Application requires the property owner do more than merely approve; the owner must grant authority to the applicant to represent and bind the owner in all matters concerning this Application, and even to "defend, indemnify and hold harmless, City and its agents from any and all liability and loss by reason of its reliance on any such information." This clearly goes above and beyond what is required within the Ordinance, or the espoused reasons for enactment of the Ordinance.

The following section of the Application describes, "WHAT TO INCLUDE IN GROUP HOME HOUSE RULES," and lists a series of rules and regulations that

12

the applicant is ordered to impose unto his/her group home. The Application attempts to impose rules on a number of topics. Some are addressed in the Ordinance, like parking. Others include: housekeeping, curfews, food storage, sexual relations, and "mutual respect." And, yes, the City of Costa Mesa is requiring that landlords place limitations on sexual relations between consenting adults who live together! In enforcing these rules, the Application effectively eliminates the group home owners/operator's ability to operate their sober living home as they see fit – and successfully requires policies not found in the Ordinance.

The Ordinance requires applicants to impose a "Good Neighbor Policy," that directs "occupants to be considerate of neighbors, including refraining from … excessively loud, profane or obnoxious behavior that would unduly interfere with a neighbor's use and enjoyment of their dwelling unit," and requires a protocol for dealing with complaints. Section 13-311(a)(10). Why the disabled are singled out for this is unclear –loud, profane, obnoxious behavior is apparently acceptable from those not in recovery.

And, City's zoning rules are silent as to dress codes and sexual relations between consenting adults within the adult's own home – unless the tenants are recovering addicts trying to live in a sober home with other persons in recovery.

One section of the Application is entitled "Relapse Policy (Preparation Guide)." Section 13-311(a)(1)(5) requires that a relapse policy must be submitted

13

for approval of the special use permit. This is the only place the Ordinance mentions the relapse policy; thus, the Ordinance does not provide specific rules that must be included in order to receive a special use permit. Yet the Application is not shy about a relapse policy that covers everything from "Intake Procedures," "Identify Financially Responsible Family or Entity," and "First Relapse/Minor Infraction," to "Second Relapse/Major Infraction," "Client Discharge Procedures Following a Relapse," and "Other Policies and Procedures." The Application packet even requires sober living home operators to undertake responsibilities for tenants no other landlord – boardinghouse or otherwise – must take on: if a person is removed from a sober living home due to relapse, the operator is required to buy them a ticket home. That is nowhere in the Ordinance, and a severe burden on sober living homes that is suffered by no other class of landlord.

The final section of the Application is entitled, "Group Home-Live Scan Fingerprinting." The Application requires, "[p]er the Costa Mesa Municipal Code, all owners/operators and key staff members of the Group Homes must pass a background check." This statement is false. The Ordinance does not provide that a background check is required in order to obtain a special use permit. Section 13-311(b)(2-4) states the permit will be denied if any owner/operator or staff person has been "convicted of or pleaded nolo contendere" to offenses listed in Section 13-311(b)(3)(i-iv). The Ordinance also asserts that the permit will be denied if the

14

owner/operator or staff person is on parole or probation. The Application imposes this requirement while the Ordinance never states a live scan report is necessary.

Imagine a zoning ordinance that told members of a race that they could not live too close to one another in the City's best neighborhoods, and if they found a house which was not too close to others of their race, they had to follow special rules of conduct not expected of other races while being supervised round-the-clock by persons of a preferred race and, if they failed to follow those special rules, they have to leave. Switch race with disabled; that is this Ordinance.

### III. ENFORCEMENT OF THE ORDINANCE SHOULD BE PROHIBITED TO PRESERVE THE STATUS QUO PENDING DETERMINATION OF THE RIGHTS OF THE PARTIES.

If this Court does not intervene now, then many of SL' tenants will probably be on the street by the time this case gets to hearing. The *status quo* must be protected or victory at trial for Solid Landings will be pyrrhic indeed. Solid Landings has no fewer than 8 group homes that are within 650 feet of another – and has no idea they within 650 feet of one run by someone else. [Fennelly Decl., paragraphs 11, 12, Doc. No. 44-3.] That means that neither SL, other sober living home operators, nor the City has any idea how many sober living homes will have to shut down when the ordinance takes effect.

The City's assurance that "reasonable accommodation" can be requested is illusory. The Ordinance's own language shows the response to be obtuse. The

15

Ordinance provides that living near the disabled, "undermine[s] the benefits of home ownership in single-family neighborhoods." Ordinance, Recitals, P. 3. At the same time, the City considers whether a requested reasonable accommodation "would fundamentally alter the character of the neighborhood." Ordinance, Section 13-200.62(g)(1). The Ordinance, on its face, discourages its own accommodations.

Staying enforcement of the Ordinance by injunction allows for the newly-sober to continue living where they are unless and until this Court determines that the Ordinance is enforceable. SL is confident in prevailing.

While an injunction does not issue to simply afford the sought relief, this injunction does not do that. While it does put off enforcement, it does so temporarily. If the injunction is granted and City ultimately prevails, the ordinance will be no less effective. But refusing injunctive relief will result in the loss of sober living environments for persons who are trying to continue their battle against addiction. Forcefully removing them under the color of law, shaming them for their efforts, making it clear that they would not be subject to the opprobrium of the sovereign had they only just kept using, is bad policy, bad reasoning, and damages that may be incalculable in any terms other than a lost life.

## IV. IRREPARABLE INJURY AND INADEQUATE LEGAL REMEDIES – ARE ALL IMPLICATED BY ORDINANCE.

The FHA, 42 U.S.C. 3604(f)(2), makes it unlawful, "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or

in the provision of services or facilities in connection with such dwelling, because of a handicap of (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." See, *Bangerter v. City of Orem*, 46 F3d 1491 (10th Cir. 1995). SL has shown a clear probability of prevailing at trial: the Ordinance limits site selection for no greater purpose than dispersal [reducing over-concentration] and requires 24 hour on-site management. These are prohibited by the FHA. *Human Res. & Mgmt. Group v. County of Suffolk*, 687 F. Supp. 2d 237, 258-263 (E.D.N.Y. 2010).

Harm is irreparable where it is a type of injury for which a monetary award would fail to be adequate compensation. See *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1991). And "where a plaintiff demonstrates a likelihood of success on the merits of a fair housing claim, irreparable injury may be presumed." *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999). SL' likelihood of success is clear: the Ordinance places discriminatory limitations on the ability of the disabled to find housing in Costa Mesa's R1 neighborhoods.

Housing discrimination causes a uniquely immediate injury. *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 200 (2000). 42 U.S.C. § 3613(c) of the FHA specifically provides for injunctive relief. Indeed, irreparable

17

injury may be presumed from the fact of discrimination and violation of fair housing statutes. *Gresham v. Windrush Partners*, 730 F.2d 1417, 1423 (11th Cir.). And a traditional showing of irreparable harm is not required where the plaintiff requests equitable relief to prevent violation of a federal statute that provides for injunctive relief. *Baxter v. Belleville*, 720 F. Supp. 720, 734 (1989).

### A. Plaintiffs and all persons seeking treatment and recovery from addiction in City will be irreparably injured by enforcement of the Ordinance.

SL's injury is irreparable because the closure of homes will cast persons in recovery from addiction out of their homes and into chaos; that significantly increases the likelihood of relapse and more likely than not will force some onto the street. See, Fennelly Decl., Doc. No. 44-3.

Oddly, compliance with the Ordinance turns the sober living home into a residential care facility that has to be licensed by the state, which then removes it from the Ordinance. That is because the Ordinance requires that a house manager be at the site 24 hours per day. Ordinance, § 13-311(a)(4). 24 hour presence of a house manager turns the sober living home from what it currently is, a sober living home, into a supervised environment, and a supervised environment must be licensed for providing treatment and recovery. Health & Safety Code § 11834.26; 22 Cal. Code Reg. 80001(c)(3). Finally, the Ordinance requires anyone who wishes to rent a space to a recovering alcoholic to get a license from the state even though

the state itself does not require that person to have the license. It is therefore a licensure requirement that is facially invalid, just like the license requirement in *Human Res. Research & Mgmt. Group, supra.*

### B. There can be no adequate legal remedy for interrupted efforts at recovery.

SL serves its clients by assisting them with recovery from addiction. Closing some of its homes – and closing some of its competitors' homes – cannot be adequately addressed with money damages. The purpose of sober living homes is to forward an addict's effort to live in sobriety. Shutting its homes down results in damages that are impossible to quantify, and may never be remedied; each client will be affected differently, some irreparably.

Immediate relief is necessary here. The City has made it plain. Those homes that are within 650 feet of another will be locked in a race to City Hall. SL has at least 8 homes, some of which, perhaps all of which, will have to close. The Ordinance, it offers no predictability as to which homes will have to shut down or whose clients will be kicked out onto the streets. It is impossible for SL to comply because some of its own homes are too close to one another under the Ordinance. SL is in immediate violation; immediate relief is required, or an unknown number of persons who are trying to recover from an addiction will be kicked to the curb. "It's that simple."

Yes; frighteningly, it is.

19

## V.    CONCLUSION

Sober living homes are not like the pornography industry.  The City's vendetta against sober living homes has nothing to do with curbing bad conduct, but is politically motivated, fueled by the biases and prejudices of a few.  The City's violations of law are clear and appear on the face of the Ordinance – the likelihood of prevailing is established.  The irreparable harm is presumed.  It is impossible for SL to avoid immediate non-compliance. A preliminary injunction should therefore issue staying enforcement of the Ordinance [Costa Mesa Ordinance No. 14-13] pending review by this Court.  In the alternative, should this Court find that parts of the Ordinance are not enforceable but other parts are, this Court should stay enforcement of those parts that are unenforceable.  This is a clear case where judicial intervention is necessary to protect people from the egregious, excesses of their government.

Dated:  September 25, 2015          Respectfully submitted,

HERR PEDERSEN & BERGLUND LLP

By: /s/ Leonard C. Herr
                      LEONARD C. HERR
                Attorneys for Plaintiffs/Appellants

20

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to C.R. 32(a)(5)(6) the undersigned certifies that the brief is proportionately spaced and has a typeface of 14 points or more and has 4915 words.

Dated:  September 25, 2015        Respectfully submitted,

HERR PEDERSEN & BERGLUND LLP

By:    /s/ Leonard C. Herr
       LEONARD C. HERR
       Attorneys for Plaintiffs/Appellants

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2015, I electronically filed the foregoing Second Motion for Preliminary Injunction Pending Review [FRAP 8] with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 25th day of September, 2015 at Visalia, California

Rose Ochoa